IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Ibrahim Abdullah Jabbar a/k/a )
Marcus Lane, Sr., )
   Plaintiff, )
)
v. ) 1:09cv246 (TSE/TCB)
)
Lt. Col. Burnett, et al., )
   Defendants. )

FILED SEP - 9 2010 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

Ibrahim Abdullah Jabbar a/k/a Marcus Lane, Sr., a Virginia inmate proceeding pro se, has filed a civil rights action pursuant to 42 U.S.C. § 1983, asserting that defendants violated his constitutional rights in several respects during his former incarceration at the Richmond City Jail ("RCJ").[1] In his amended complaint, plaintiff asserted claims of: (1) deliberate indifference to plaintiff's serious medical needs by Dr. Furman, Nurse Ford, Major Robinson, and Sheriff C. T. Woody; (2) cruel and unusual punishment due to the unconstitutional conditions of confinement at RCJ; and (3) violation of plaintiff's First Amendment right to free exercise of his religion against Sheriff Woody, Lt. Col. Burnett, Capt. McRae and Chaplain Pruitt. By Memorandum Opinion and Order dated September 29, 2009, plaintiff's claims of deliberate indifference and cruel and unusual punishment were dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915 (b)(1), and defendants Sheriff Woody, Major Robinson, Dr. Furman, Sgt. Jones, Deputy Harris, and Nurse Ford

---

[1] During his confinement at the RCJ, plaintiff was a pretrial detainee. However, during the pendency of this action, plaintiff informed the Court that he was transferred to the custody of the Virginia Department of Corrections to begin his service of a sentence of five years and 13 months incarceration. Am. Compl. at 5.

1

were dismissed as parties to the action. Jabbar v. Woody, et al., 1:09cv246 (E.D. Va. Sep. 29, 2009).[2]

Now at issue is a Motion for Summary Judgment with a supporting memorandum of law filed by remaining defendants Lt. Col. Burnett, Capt. McRae, and Chaplain Pruitt as to plaintiff's claim that his First Amendment right to free exercise of his religion was violated at RCJ. Defendants provided plaintiff with notice as required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) that plaintiff could file responsive materials within twenty (20) days. Plaintiff filed a pleading captioned as In Opposition to Summary Judgment with a supporting affidavit, and defendants filed a reply. For the reasons that follow, defendants' Motion for Summary Judgment must be granted, and summary final judgment must be entered in their favor on plaintiff's First Amendment claim.

After defendants moved for summary judgment, plaintiff filed a pleading captioned as a Motion to Amend and Expand the Record. In legal effect, however, plaintiff's motion requests that his complaint be amended to add a claim that defendants' conduct violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc. Because the amendment plaintiff seeks would be futile, his Motion to Amend and Expand the Record, construed as a motion to amend the complaint, must be denied. Motions by the defendants to transfer venue, and by the plaintiff for matters related to a discovery and for the appointment of counsel, also must be denied.

---

[2]Plaintiff appealed the September 29 Memorandum Opinion and Order, which the Fourth Circuit dismissed for lack of jurisdiction. Jabbar v. Woody, Case No. 09-7929 (4th Cir. Feb. 25, 2010) (Docket ## 57 - 58).

2

## I. Background

In his Amended Complaint (Docket # 16), which is the operative complaint in the case as to plaintiff's First Amendment claim, plaintiff alleges that he converted to the Muslim faith in 1979, and his adherence to its tenets was made known to defendants. According to plaintiff, he is obligated by a verse in the Holy Qur'an to pray the prayer of Al-Jumah on Fridays. This must be done in congregation and cannot be substituted with any other act of worship. Am. Compl. at 23. From the inception of plaintiff's incarceration in August 2007, until December 2008, plaintiff's name was included on the RCJ list of inmates who were permitted to attend Jumah services and all other Islamic programs. During that time, plaintiff witnessed nothing during Jumah prayers that could be construed as threatening to institutional security. However, in December 2008, plaintiff's name was removed from "the Islamic list," allegedly by defendants Burnett, McRae and Pruitt. Am. Compl. at 24. Plaintiff submitted several grievances concerning his inability to attend the Jumah prayers, and even pointed out that the Holy Qur'an states that if a believer misses more than three (3) Jumahs his sins will not be forgiven, but the grievances were ignored or not resolved.

The record reflects the following undisputed material facts. During plaintiff's incarceration at RCJ from December, 2008 through April, 2009, he was confined in the D-1 housing unit. D-1 is one of four high-security units where inmates are kept apart from RCJ's general population. Burnett Dec. ¶ 4; McRae Dec. ¶ 4; Pruitt Dec. ¶ 4.[3] RCJ's long-standing policy, which was not promulgated by any of the defendants, allows inmates who are housed in such high-security units to conduct and

---

[3]The sworn declarations of the defendants, as well as that of Donna Kirksey, are attached as exhibits to defendants' Memorandum in Support of their Motion for Summary Judgment. (Docket # 41). Those statements reveal that defendant Burnett is the Commander of Jail Operations at RCJ, defendant McRae works in the Jail Operation Department, and defendant Pruitt is the Undersheriff and Chief of Chaplains. Declarant Kirksey is RCJ's Classification Manager.

to attend religious services within their particular housing tiers, but they are not permitted to attend religious services in general population areas. Burnett Dec. ¶ 4; Pruitt Dec. ¶ 4. The rationale for prohibiting high-security inmates like plaintiff from attending religious services in general population is that allowing the two populations to interact and mingle poses a significant security risk that can lead to violent altercations among inmates. Burnett Dec. ¶ 5; Pruitt Dec. ¶ 5. No exceptions to this policy are permitted because making an exception for one high-security inmate would likely cause friction and violent confrontations between that inmate and others within the same housing tier. Burnett Dec. ¶ 6; Pruitt Dec. ¶ 6.

RCJ's anti-mingling policy is not designed to, nor does it, prohibit high-security inmates from conducting or attending religious services, including Jumah, within the high-security housing tiers. Pruitt Dec. ¶ 6. Jumah must be held shortly after noon on Fridays, so an inmate who is elected as the local imam by his fellow inmates leads Jumah in RCJ's general population every Friday at 1:30 p.m. Despite efforts by RCJ to recruit more volunteer imams, a separate imam was not available to conduct Jumah in for the inmates confined in the D-1 housing tier during the time period at issue here. Id. Had an imam volunteered or been found to lead Jumah services in the D-1 tier, plaintiff could have attended. Burnett Dec. ¶ 8; Pruitt Dec. ¶ 6. In addition, plaintiff himself could have conducted Jumah services in his housing tier during his incarceration. Pruitt Dec. ¶ 6.

Defendants point out that in addition to making Jumah services available to Islamic inmates, RCJ has granted a waiver of the ban on hardcover books to allow Islamic inmates to keep copies of the Koran in their jail cells. Islamic inmates are also permitted to keep other religious materials in their cells. Burnett Dec. ¶ 8; Pruitt Dec. ¶ 8. Defendant Pruitt, Chief of Chaplains at RCJ, attests that "[i]t is not Jail policy to prohibit Islamic inmates from practicing their faith, and [he] never ha[s]

4

prohibited any Islamic inmates from practicing their faith." Pruitt Dec. ¶ 7.

Declarant Kirksey, Classifications Manager at RCJ, reports that plaintiff was assigned to the D-1 housing tier upon his incarceration in March, 2008. Kirksey Dec. ¶ 3. On October 29, 2008, plaintiff became eligible to be placed in general population housing. Kirksey Dec. ¶ 4. Sometime thereafter, Kirksey spoke to plaintiff about the possibility of being placed in general population. However, all beds in general population housing are three-tier bunk beds, and a newly-assigned inmate must select a bed that is not taken. Plaintiff asked Kirksey to assign him to a bottom bunk in the general population housing because he allegedly had a medical condition that made it difficult to climb into a higher bunk. Kirksey informed plaintiff that it was not RCJ policy to assign general population inmates to particular beds, and that he would have to wait to see what was available. After that conversation, plaintiff elected to remain confined in the D-1 housing unit. Kirksey Dec. ¶ 5. Plaintiff later told defendant McRae that he had decided to remain in the D-1 unit because Lt. Kirksey could not guarantee him that he would receive a bottom bunk if he moved to general population. McRae Dec. ¶ 5.

In the affidavit plaintiff submitted in response to defendants' summary judgment motion, he attests that from March until approximately November 2008, he was allowed to attend Jumah with others. Plf. Aff. ¶ 2. Plaintiff states that "at no time" did he "cause[] or participate[] in matter[s] that imposed an undue burden on Defendants." Plf. Aff. ¶ 5. Plaintiff states that defendants could have allowed him both to attend Jumah and to have a bottom bunk by transferring him to the A-3-L medical housing tier for which plaintiff would have been eligible because he suffers from "medical issues" such as bone spurs on his spinal cord, degenerative disc disease, nerve damage in his neck and back, and a separated right shoulder. Plf. Aff. ¶ 6.

5

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden of production then shifts to the non-moving party to point out the specific facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Facts the moving party bears the burden of proving are facts that are material. As the Supreme Court has noted, "the substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving

party. Matsushita, 475 U.S. at 587.

### III. Analysis

In their Motion for Summary Judgment on plaintiff's First Amendment claim, defendants argue that plaintiff is not entitled to relief because he has failed to show that the RCJ's policy of not allowing high-security inmates to leave their housing tiers and mingle with other inmates put "substantial pressure" on plaintiff's right to practice his faith. Defendants also contend that defendants Burnett and McRae can have no liability to plaintiff on the basis of *respondeat superior*, and that all defendants are entitled to qualified immunity. Each of these positions is meritorious, as will be discussed.

#### A. Plaintiff's First Amendment Rights Were Not Substantially Burdened

The First Amendment protects an individual's right to the free exercise of religion. U.S. Const. amend I. Although incarcerated, a prisoner still "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). To merit protection under the Free Exercise Clause of the First Amendment, a plaintiff must satisfy two threshold criteria. First, plaintiff must allege that his belief or beliefs are sincerely held. Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). Second, plaintiff also must demonstrate that his claim is rooted in "religious" and not "purely secular" philosophical concerns. Id.; see Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 713-14 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise Clause, which by its terms, gives special protection to the exercise of religion."). To be recognized as religious, sincerely held beliefs need not be "acceptable, logical, consistent, or comprehensive to others," Thomas, 450 U.S. at 714; based on the existence of a supreme being or

7

beings, see Torcaso v. Watkins, 367 U.S. 488, 495 & n. 11 (1961); Myers v. Loudon County Public Schools, 418 F.3d 395, 411 (4th Cir. 2005) (quoting Torcaso, 367 U.S. at 495 n.11 for the proposition that the "Supreme Court has long recognized that some religions practiced in this country 'do not teach what would generally be considered to be a belief in the existence of God'"); or based in or on a mainstream faith. See Thomas, 450 U.S. at 714. In this case, the undisputed record demonstrates that plaintiff is a sincere adherent to the Islamic faith, and that plaintiff's religious beliefs merit protection under the First Amendment.

This does not end the analysis, for inmates' constitutional rights must be evaluated within the context of their incarceration. The Supreme Court has emphasized that "when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective or prison administration, safeguarding institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979); accord, Dettmer v. Landon, 799 F.2d 929 (4th Cir. 1986), cert. denied, 483 U.S. 1007 (1987). At the same time, it is well recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." Procunier v. Martinez, 416 U.S. 396, 405 (1974). "Running a prison is an inordinately difficult undertaking," and courts acknowledge that the task of doing so is "peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84-85 (1987). Therefore, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir.2006). A prisoner's federal constitutional rights, including his sincere desire to practice a religion, may be burdened upon a showing that the restriction is reasonably related to legitimate penological interests. O'Lone v. Estate of Shabazz, 482 U.S. 342,

349 (1987) (citing Turner, 482 U.S. at 89). In making such a determination, courts must consider:

> (1) whether there is a 'valid, rational connection' between the prison regulation or action and the interest asserted by the government, or whether this interest is 'so remote as to render the policy arbitrary or irrational'; (2) whether 'alternative means of exercising the right ... remain open to prison inmates,' an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any 'obvious easy alternatives' to the challenged regulation or action, which may suggest that it is 'not reasonable, but is [instead] an exaggerated response to prison concerns.'

Lovelace, 472 F.3d at 200 (quoting Turner, 482 U.S. at 89 - 92 (internal quotation marks and citations omitted)).

The application of these governing legal principles to the uncontroverted facts of this case compels the conclusion that defendants are entitled to summary judgment on plaintiff's First Amendment claim. All four of the Lovelace criteria are satisfied here. As to the first factor, there is no dispute that RCJ's policy requiring high-security inmates like plaintiff to attend religious services in their own housing tiers is reasonably related to legitimate penological interests. It has been shown that allowing high-security inmates to mingle with the Jail's general population would impose a significant security risk, because it could lead to violent altercations between prisoners. Burnett Dec. ¶ 5; Pruitt Dec. ¶ 5. In addition, carving out an exception to this policy for an individual inmate could well lead to violence between that inmate and others confined in his same housing tier. Therefore, there is a 'valid, rational connection' between RCJ's anti-mingling policy and the corollary requirement that inmates must conduct and attend religious services in their own housing tiers, and the penological interest of maintaining order within the institution.

9

In his opposition to defendants' summary judgment motion, plaintiff suggests that the asserted fact that he attended Jumah with general population inmates for two months without incident illustrates that RCJ's anti-mingling policy is not reasonably related to legitimate penological concerns. Yet, the uncontroverted declaration of defendant Burnett, the Commander of Jail Operations at RCJ, establishes that the policy is premised on the avoidance of friction and fighting between high-security inmates and those housed in general population. The fact that plaintiff allegedly was able somehow to circumvent Jail policy and to attend Jumah in general population for a period of time without violence does not make RCJ's policy concerns any less legitimate.[4]

As to the second Lovelace factor, it is apparent that RCJ's policy requiring plaintiff to worship on his own housing tier did not prevent plaintiff from practicing his faith during his incarceration. Plaintiff could have attended Jumah on the D-1 housing tier had an imam been available, or he could have volunteered to conduct such services himself. Most telling is the fact that plaintiff was given an opportunity to transfer to general population at the Jail, where he could have attended the ongoing weekly Jumah services, but plaintiff opted not to do so because a chance existed that no bottom bunk would have been available to him if he moved from his high-security housing placement. Clearly, from that point forward, plaintiff's inability to attend Jumah cannot be viewed as stemming from any RCJ's policy, but rather from plaintiff's election to remain confined

---

[4]Plaintiff claims that his name was on a "list" that allowed him to attend Jumah in general population, and that his name subsequently was removed. Plf. Aff. ¶¶ 3, 9; Am. Compl. at 23. Defendant Chaplain Pruitt denies having any knowledge of plaintiff either being on a list that allowed plaintiff to attend religious services or being removed from such a list. Pruitt Dec. ¶ 3. This does not amount to a dispute of material fact barring summary judgment inasmuch as the question of how it came to pass that plaintiff attended Jumah in general population is not material to the question whether his constitutional rights were abridged when he was not permitted to leave his high-security tier housing to attend services.

on the D-1 housing tier.

Plaintiff suggests in his opposition to defendants' summary judgment request that he could have both attended Jumah regularly and been assured of a bottom bunk had he been transferred to the A-3-L medical tier at RCJ. Plf. Aff. ¶ 6. However, plaintiff's argument overlooks the undisputed fact that the A housing tier at RCJ is a high security tier and hence is subject to the same security restrictions that plaintiff experienced during his confinement on the D tier. Burnett Dec. ¶ 4; McRae Dec. ¶ 4; Pruitt Dec. ¶ 4; Kirksey Dec. ¶ 3. Therefore, pursuant to RCJ policy, had plaintiff been placed on the A tier, he would have been required to attend Jumah and other religious services there, rather than in general population. To be sure, the only way plaintiff could have participated in Jumah in general population would have been for him to accept a transfer to general population, yet plaintiff chose to reject that option when it was offered to him lest he be assigned to an upper-level bunk.

As to the remaining two Lovelace criteria, RCJ's policy has not been shown to have had any negative impact on the institution's security staff, inmates, and resources. Nor has there been any demonstration that "obvious easy alternatives" to the anti-mingling policy existed, such that it constituted "an exaggerated response to prison concerns." Consequently, it is clear that the RCJ restriction at issue in this case is reasonably related to legitimate penological interests.

It is equally clear that the RCJ policy that required plaintiff to attend Jumah on his own housing tier did not substantially burden plaintiff's First Amendment rights. In the context of the free exercise of religion, only those hardships that put "substantial pressure" on an adherent to change or to abandon his religious principles violate the Constitution. Lovelace, 472 F.3d at 200. Plaintiff in this case states that the Jumah service must take place in a congregation of at least three worshipers, Plf. Aff. ¶ 12, and he reports that he experiences doubts because he could not follow

Allah's command to do so. Plf. Opp. to Summ. Judg. ¶ 13. However, at no point in the record does plaintiff claim that he felt substantial pressure to abandon or to change his devotion to Allah's principles as the result of defendants' actions. Accordingly, there is no persuasive basis to conclude that plaintiff's inability to attend Jumah services in RCJ's general population substantially burdened his First Amendment rights. As there are no material facts genuinely in dispute, and the evidence as a whole could not lead a rational fact finder to rule for the plaintiff, defendants are entitled to the summary judgment they seek on plaintiff's First Amendment claim. Matsushita, 475 U.S. at 587.

### B. Defendants Burnett and McRae Can Have No Liability to Plaintiff

Even if defendants, as a group, were not entitled to summary disposition of plaintiff's First Amendment claim, it is apparent at this juncture that defendants Burnett and McRae could have no liability to plaintiff for the harm he asserts. It is uncontested that neither Burnett nor McRae promulgated or adopted RCJ's anti-mingling policy. Burnett Dec. ¶ 4. Plaintiff makes no allegations that either Burnett or McRae acted personally to deprive him of his constitutional rights, and thus it is clear that both were named as defendants in this action solely on the basis of their supervisory positions. It is true that supervisory officials in limited circumstances may be held liable for constitutional injuries inflicted by their subordinates. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984)). Importantly, however, this liability is not premised on respondeat superior, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. at 798 (quoting Slakan, 737 F.2d at 372-73). It follows, then, that "liability ultimately is determined 'by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue

unchecked.'" Id. at 798 (quoting Slakan, 737 F.2d at 376). Thus, in order to establish supervisory liability under § 1983, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799 (citations omitted). In other words, a supervisory official can be liable under § 1983 for the conduct of his subordinates when the evidence shows that conduct directly causing the deprivation was done to perpetuate an official policy or custom for which the official is responsible. Fisher v. Washington Metro Transit Auth., 690 F.2d 1133, 1143 (4th Cir. 1982), abrogated on other grounds, Co. of Riverside v. McLaughlin, 500 U.S. 44 (1991). Here, defendants Burnett or McRae deny having such responsibility, and plaintiff has come forward with no facts demonstrating that defendants had actual or constructive knowledge that their subordinates were engaged in conduct that violated plaintiff's constitutional rights. Therefore, even assuming plaintiff's First Amendment claim had escaped summary judgment on the merits, defendants Burnett and McRae still would be entitled to summary judgment in their favor, as they can have no vicarious liability to plaintiff for the harm he alleges.

### C. Qualified Immunity

Even if plaintiff otherwise had demonstrated that his rights under the First Amendment were abridged, defendants would be entitled to qualified immunity for their actions. The "threshold question" in a qualified immunity analysis is whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts show [that] the officer's conduct violated a constitutional

right." Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id., see also, Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir. 2002). If the facts alleged do show a constitutional violation, "the next step is to ask whether the constitutional right was clearly established in the specific context of the case. Figg, 312 F.3d at 365. "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202, quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "Under the doctrine of qualified immunity, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" Figg, 312 F.3d at 636, quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

These principles, applied here, point persuasively to the conclusion that defendants are entitled to qualified immunity on plaintiff's First Amendment claim. While Jabbar's right to exercise his religion freely was clearly established, it was not clearly established, either at the time the salient events took place or now, that requiring high-security inmates to attend religious services within their housing tiers rather than with general population is not reasonably related to a correctional institution's legitimate penological concern of maintaining order and security. Accordingly, even if plaintiff otherwise had come forward with a sufficient demonstration that his First Amendment rights were abridged by RCJ's policy concerning Jumah services, defendants are entitled to qualified immunity on the claim.

14

## IV. Plaintiff's Motion to Amend and Expand the Record

In his Motion to Amend and Expand the Record, which in legal effect is a motion to amend the amended complaint (Docket # 55), plaintiff reiterates the same factual allegations discussed above, and asserts that his rights under RLUIPA were violated. Because defendants filed their dispositive motion before plaintiff sought leave to amend, plaintiff's motion is governed by Fed. R. Civ. P. 15(a), which provides that once a defendant has filed a responsive pleading, plaintiff may amend his complaint only with leave of court or by written consent of the defendant. Leave of court to amend "shall be given freely when justice so requires." Id. The Supreme Court has elaborated on this standard as follows:

> In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on behalf of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should ... be 'freely given.'

Foman v. Davis, 371 U.S. 178, 182 (1962). The Fourth Circuit interprets this directive to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986) (citing Foman, 371 U.S. at 182). While it thus is apodictic that amendments to complaints are to be freely allowed, particularly in the context of pro se litigation,[5] in this instance plaintiff's proposed amendment to his complaint to assert a claim under RLUIPA would be futile, and thus his motion

---

[5] See, e.g., Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir.), cert. denied, 439 U.S. 970 (1978) (holding that pro se civil rights plaintiff should be granted leave to amend despite failure to state how he could cure deficiencies).

15

to amend must be denied.

. As noted above, plaintiff is no longer confined at RCJ, as he has been transferred to the custody of the Virginia Department of Corrections. See n. 1, supra. "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009), quoting Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Therefore, at this juncture plaintiff can state no claim under RLUIPA for injunctive relief as to RCJ's anti-mingling policy with respect to Jumah services.

Nor are monetary damages available to plaintiff under RLUIPA. Significantly, RLUIPA does not waive states' Eleventh Amendment sovereign immunity from suit for monetary damages, and hence plaintiff can have no claim for monetary damages against defendants in their official capacities. See Madison v. Virginia, 474 F.3d 118, 131 (4th Cir. 2006) (holding in case where inmate sued under RLUIPA for deprivation of kosher meals that the Eleventh Amendment barred his claim for monetary relief against the state). Moreover, the Fourth Circuit has held that if jurisdiction under RLUIPA is based on the spending clause, RLUIPA does not authorize a claim for money damages against prison officials sued in their individual capacities. Rendelman, 569 F.3d at 187 - 89. The court in that case recognized that Congress had the right to enact RLUIPA under the spending clause to control the actions of state and local entities and officials who receive federal funding. In addition, RLUIPA itself allows Congress to act when the actions at issue affect interstate commerce. Rendelman, 569 F.3d at 187 - 89. When Congress desires to impose a condition under the spending clause, "it is Congress' burden to 'affirmatively impos[e] [the] 'condition in clear and unmistakable statutory terms.'" Id. at 189, quoting Virginia Dep't of Education v. Riley, 106 F.3d 559, 563 (4th

Cir. 1997) (en banc). The court reasoned that "in simply defining 'government' in § 2000cc-2 to include a 'person acting under color of State law,' Congress did not signal with sufficient clarity and intent to subject such a person to an individual capacity damages claims under RLUIPA.'" Id. at 189, citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Therefore, plaintiff here cannot rely on RLUIPA's spending clause basis to pursue a claim for damages against defendants in their individual capacities. Since plaintiff makes no allegation that defendants' actions affected interstate commerce, it must be assumed that RLUIPA applies to them based solely on receipt of federal funds. Brown v. Ray, 695 F.Supp. 2d 292 (W.D.Va. 2010). Thus, monetary damages against defendants in their individual capacities are unavailable to plaintiff in this action.

Since plaintiff can state no claim against defendants for either injunctive relief or monetary damages under RLUIPA, amendment of the complaint to assert a violation of plaintiff's rights under RLUIPA would be futile. That being the case, plaintiff's Motion to Amend and Expand the Record, construed as a motion to amend the complaint, appropriately must be denied. Johnson, 785 F.2d at 509.

### V. Additional Outstanding Matters

A. Defendants' Motion to Transfer Venue

Defendants have moved for transfer of this case to the Richmond Division of this Court in the event that a hearing or trial is scheduled. (Docket # 40) Because it is apparent at this juncture that no court proceedings are necessary to resolve this matter, there is no good cause at this point to transfer this action, and defendants' Motion to Transfer Venue must be denied.

B. Plaintiff's Motions Relating to Trial

Also pending before the Court are a number of motions filed by plaintiff which appear to

anticipate a trial. Specifically, plaintiff has demanded a jury trial (Docket # 45), requested a jury trial (Docket # 54), moved for production of documents (Docket # 61), moved for discovery (Docket # 62), moved for an order compelling discovery (Docket # 64), and moved for an order providing him with court reporter services at deposition (Docket # 65). As summary judgment is being granted to defendants on plaintiff's First Amendment claim, and plaintiff's request to amend the complaint to add an additional claim will be denied, plaintiff's foregoing motions must be denied.

C. Plaintiff's Motion for Appointment of Counsel

Lastly, plaintiff has filed a Motion to Appoint Counsel, in which plaintiff asserts that he is indigent, has been unsuccessful in efforts to obtain the services of an attorney, and is hampered by his incarceration and lack of legal knowledge. (Docket # 66) A court may request an attorney to represent an indigent plaintiff proceeding in forma pauperis. 28 U.S.C. § 1915(e)(1). The Fourth Circuit, however, has limited the appointment of counsel to cases where "exceptional circumstances" exist such as cases with particularly complex factual and legal issues or with a litigant who is unable to represent himself adequately. Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984). It is unnecessary at this time to appoint counsel for plaintiff, as plaintiff has made no showing of "exceptional circumstances" in his case that would warrant appointment of counsel. In addition, to date, plaintiff has ably filed his pleadings and replied to various orders, as well as demonstrated comprehension of the procedures and laws of this Court. Thus, plaintiff's request for the appointment of counsel must be denied.

## VI. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment on plaintiff's First Amendment claim must be granted. Plaintiff's Motion to Amend and Expand the Record, construed

as a motion to amend the complaint, must be denied. Defendants' Motion to Transfer Venue, plaintiff's several motions seeking discovery and a trial, and plaintiff's Motion for Appointment of Counsel likewise will be denied. An appropriate Order shall issue.

Entered this  9th  day of  September  2010.

Alexandria, Virginia

/s/
_____
T. S. Ellis, III
United States District Judge